# The Commonwealth *ex rel.* Vandyke and Wadleigh *versus* Henry.

*Authority of Mayor of Philadelphia in relation to lease of coal-lands owned by city.*

Under the ordinance of the city councils of Philadelphia, providing that the mayor "be and he is hereby authorized to execute" leases for coal-lands of the Girard Estate in Schuylkill county to such "persons as may be accepted by the superintendent," under "the supervision of the committee of councils" on that estate; the mayor is invested with a sound discretion in executing any leases to persons applying therefor; and he cannot be compelled by *mandamus* to execute a lease, duly accepted by the superintendent under the supervision of the proper committee, where in his opinion, improper means had been used to obtain it from the committee, and the proposed leasing would be detrimental to the interests of the city and of the trust, confided to its care, under the will of Stephen Girard.

ERROR to the Supreme Court of *Philadelphia.*

This was a proceeding in the Supreme Court in banc, founded on the petition of Richard Vandyke and Mark Wadleigh, praying for a *mandamus* to Alexander Henry, Mayor of Philadelphia, commanding him to execute and deliver a certain lease which petitioners claimed to have made with the councils.

The petitioners set forth that by a resolution of the Select and Common Councils of the city of Philadelphia, approved by

[Commonwealth *ex rel.* Vandyke *v.* Henry.]

the mayor, on the 26th day of December 1861, it was resolved that the Mayor of Philadelphia be authorized to execute a lease with James C. Conner, or such other persons as may be accepted from time to time by the superintendent of the Girard estates, under the supervision of the committee on Girard estates of the coal lands in Schuylkill county, vested in the city of Philadelphia, by the last will of Stephen Girard, in the form prepared by the city solicitor, and approved by the committee on Girard estates, and reported to councils December 5th, A. D. 1861, and which is hereby made part of this resolution, to wit: [Then followed the form of the lease, with a profert of the resolution.]

That on the 13th day of August 1863, they presented an application in writing to Franklin B. Kaercher, who was then the agent of the estates situated in Schuylkill county, in the state of Pennsylvania, belonging to the city of Philadelphia, trustee under the will of Stephen Girard, deceased, for a lease of certain tracts of coal lands in Mahanoy township, in Schuylkill county, and a copy of the application was annexed.

That at a meeting of the committee of the Select and Common Councils of Philadelphia, on the Girard estates, held on the 11th day of September 1863, the said Franklin B. Kaercher, agent as aforesaid, notified the committee of the application of petitioners, which was referred to a sub-special committee to report upon the same; and at a meeting of the general committee, the special committee reported in favour of leasing to petitioners the tracts embracing Kehley's Run, east and west; whereupon the following resolution was adopted by the general committee :—

"Resolved, That a lease be granted to Messrs. Vandyke and Wadleigh for the south dipping veins on the James McNeill, Jeremiah Jackson, and William Steadman tracts in Mahanoy township, embracing Kehley's Run, east and west, in conformity with the form of lease adopted by city councils."

That on the 28th day of September 1863, Francis McCormick, the general agent of the city of Philadelphia for the Girard estates, notified petitioners of the action of the committee on Girard estates, as hereinbefore set forth, stating in the said notice that as soon as he could get a survey of the colliery, he would notify petitioners, so that they and the city could have the same executed.

That a survey was made of the premises mentioned in the resolution of the committee, and a lease prepared by the said agent, and approved by the city solicitor, in the form required by the said resolution of councils, demising to petitioners the coal lands hereinbefore described, and a certain map and papers were annexed to the said lease.

That the lease was dated the 15th day of November 1863, and on that day they executed the same in duplicate, in which they

[Commonwealth *ex rel.* Vandyke *v.* Henry.]

agreed and covenanted to be lessees of the city of Philadelphia, trustee under the will of Stephen Girard, deceased, lessor, and faithfully to observe all the agreements, stipulations, and covenants therein contained, in consideration of the mining rights thereby leased to petitioners.

That the said lease, executed in duplicate by petitioners, was then presented to the Honourable Alexander Henry, who was then and is now Mayor of the city of Philadelphia, to be executed by him as mayor of the said city, and for him to cause the seal of the said city to be attached thereto; but that he refused to execute the same as mayor, or cause the seal of the said city to be attached thereto.

That on the 16th day of February 1865 they, by their attorney, made another and formal demand upon the said Alexander Henry, to execute the said lease as Mayor of Philadelphia, but he has neglected and refused to comply with such demand, and that by reason of such refusal petitioners have suffered great damages, for which they have no specific legal remedy.

Followed by a prayer for a *mandamus* in the usual form.

On this petition an alternative *mandamus* was awarded, to which the following return was made by the respondent:—

That he is advised, and so suggests, that the said relators are not, upon the matters alleged in their said petition, entitled to their said writ of *mandamus*, for the following reasons:

1. That he is by the ordinance referred to in said petition vested with discretion to withhold his signature from the lease in said petition mentioned; and

2. That for all the matters in said petition alleged, the said relators, if entitled to any relief, have a full, clear, and adequate remedy at law. And reserving all right to these objections for return to said writ, he answers:—

"That the committee on Girard estates, by whom it is alleged in said petition that said lease was awarded, is only the creature of the councils of said city of Philadelphia, by whom said committee is established, and the members thereof appointed. And by the provisions of the 50th section of the Act of February 2d 1854, it is declared, that no member of councils, whether as a committee or otherwise, shall 'make any disbursements of corporate moneys, nor audit the accounts thereof, nor perform any other executive duties whatever.' That after the attempted award by said committee of the said lease to said petitioners, it was represe to the Select Council of said city, on the 1st day of October 1863, that the said relators were not persons of sufficient ability to fulfil the conditions of the said proposed lease, and that improper influences had been used in obtaining the award of said lease, and a resolution having been offered thereon, requesting respondent to withhold his signature from said proposed lease,.

said resolution was on said last-mentioned day referred to a special committee of five members with power to send for persons and papers, and said committee having investigated the matters thus referred to them, reported an ordinance by the terms of which this respondent was forbidden to execute said proposed lease. And respondent attaches as part of this return a copy of said report. And respondent for further return to said writ upon information and belief saith, that the award of said lease to said relators, as in said petition set forth, was a fraud upon the city of Philadelphia, in this: 1st. That there were other bidders for said lease known to the said committee before the award thereof, at prices higher and upon terms more advantageous to the city than those offered by said relators and accepted by said committee, notwithstanding which the said committee undertook to award said lease to said relators in disregard and violation of their duty and of the interests of the city.

"That one of the said relators, the said Richard Vandyke, offered the agent of the city $1000, to obtain for them the lease of the Kepley Run tract, with the full assent thereto of the said Mark Wadleigh the other of said relators."

To this answer the complainants by their counsel demurred, and the case was heard by the court in banc.

*Edward H. Weil* and *Henry M. Phillips*, for relators.

*F. Carroll Brewster*, for respondent.

The opinion of the court was delivered, June 29th 1865, by

AGNEW, J.—The questions in this cause arise upon the return of Alexander Henry, mayor of Philadelphia, to a writ of alternative *mandamus* issued out of this court. The purpose of the writ is to compel the mayor to execute a lease to the relators for certain lands of the Girard estates in Schuylkill county. He refuses to do so on two grounds: 1st. That the ordinance of December 26th 1861 vests in him a sound discretion; 2d. That the relators have been guilty of corrupt practices in procuring themselves to be nominated as lessees.

The language of the ordinance as recited in the petition is this: "The Mayor of Philadelphia be and he is hereby authorized to execute a lease with James C. Connor, or such other persons as may be accepted from time to time, by the superintendent of the Girard estates, under the supervision of the committee on Girard estates of the coal lands in Schuylkill county, vested in the city of Philadelphia by the last will of Stephen Girard; in the form prepared by the city solicitor, and approved by the committee on Girard estates, and reported to councils December 5th 1861."

There are acts of legislation where "may" will be interpreted

to mean "shall," or where the language of mere authority will be held to be a command.   But there the interpretation is supported by a necessary purpose to be accomplished, or an imperative duty to be performed.   The letter of the law is violated to preserve its spirit and intent.   But is this such a case? Neither the purpose of the ordinance, the mode of execution, nor the depositary of ' the power, demands that his authority shall be construed to be a command.   The purpose and subject-matter of this municipal legislation are inseparably united, and we are much enlightened as to these by the report of a committee of five, of councils, referring to the very lease in question.   The chairman of this committee is a distinguished member of the Philadelphia bar, well known to this court.   We learn from the report that " the coal lands belonging to the Girard estates are the most valuable of all the productive properties of the city. Their proper management requires all the skill and integrity that its officers can command.   Their value and productiveness are subject to constant fluctuations, and those who have the leasing of them will always be exposed to the importunities of speculators."

" For the purpose of protecting the lands from depredations in former years, and now for the additional purposes of acquiring and conveying to the proper department here information as to the character of the parties making offers, and seeing that the terms of leases that may be made are complied with, an agent resident at Pottsville is employed.   He has the charge of all these valuable properties, is believed to have influence with the officers of the city, resides at the very centre of temptation, and yet has so small a salary that he is almost encouraged to supplement it by improper means."

It is manifest from this account, that the subject of the ordinance requires the greatest deliberation and the exercise of the wisest discretion, before leases binding the city should be executed.

In the mode established by the ordinance, we find the mayor playing no subordinate part.   The right of granting the lease is not vested finally in any other person or body.   It is he who does the last and important act which concludes the city, and this he does in a prescribed and settled form adopted by the councils.   But as a preliminary to the exercise of this authority, and as a check on hasty or ill-advised leasing, the applicant is to be accepted by the superintendent, under the supervision of the committee on the Girard estates.   This accords with the nature and importance of the subject, and secures full information upon distant properties, and the persons to become tenants, while the final responsibility is cast upon the single head and chief executive of the corporation.   The superintendent receives the application and accept the tenant under the supervision of the com-

mittee, and the mayor concludes the transaction by formally executing and delivering the lease. Care and deliberation are thus secured, and they are shared in by the head of the corporation. It is only by distorting a mere authority into a command, the mayor is made to perform a purely ministerial duty. It is at variance with the language of the ordinance and the character and powers of the officer selected as the final depositary of the power. There is not a word in it devolving the whole duty of leasing upon the superintendent and his supervising committee. Now, clearly, when the ordinance said he was authorized, it did not mean he was commanded, when upon him fell the important duty of concluding the lease; and if before completion, he should discover strong reasons why the bargain should not be consummated, certainly his official character and duty would require him to pause, and not to be compelled forward to the execution of the paper like a mere automaton.

He has a veto on the legislation of the councils, and in approving of this ordinance, it cannot be supposed he intended to ignore his own position, and the important duty of supervision committed to him by the charter. The seventh section of the Act of 2d February 1854, among other important features, imposes on him the duty of " vigilance and activity in causing the laws and ordinances of the city to be duly executed," and the exercise of a constant "supervision and control over the conduct of all subordinate officers." Connecting these provisions with that of the 50th section, forbidding any member or members of councils, whether as committee or otherwise, to perform any *executive* duty whatever, it is difficult to suppose that the ordinance in question intended to strip him of all supervision. Upon the whole, there seems to be no good reason why the language of mere authority should, by judicial construction, be converted into that of absolute command.

It is not to be forgotten that the ordinance which we are considering, and its subject-matter, have relation to the execution of a private trust reposed in the city by the will of Mr. Girard, and not to the execution of merely public duties, and that the interests of the trust are therefore to be protected by the court.

The facts of this case furnish also an ample reason for the interpretation now given to the ordinance. We should be glad, for the honor of those concerned, to discredit the disgraceful transactions stated in the paper-book. But the return of the highest officer of the city, an upright citizen, as there is every reason to suppose, under his solemn oath, founded upon the report of a highly respectable committee, and upon the testimony accompanying it, is a source of information we cannot reject in this proceeding. The matters thus presented, proceeding not only from the immediate parties, but from members of

the councils also, are shocking to the moral sense of good men. A committee of three members of the councils was appointed to investigate certain charges against the resident agent in Schuylkill county, and also to report upon the propriety of making certain leases. The lease claimed by the relators is one that was recommended by this committee. Strange to say, the conduct of this committee became the subject of investigation, and of the report of the committee of five before referred to. From the evidence taken, we learn that two of the members of the committee of three began operations by endeavouring to impress upon Dengler and Robinson, whose lease they were to inquire into, how much would depend upon their report, referring to " what was customary in legislative bodies, when anything was wanted in the shape of important bills." The result of this hint may be detailed in the language of the witness: " I sat beside him (the member named) on the settee on the porch, and told him to name his figures. He told me that the other members of the committee wanted a pretty large sum, but he had got them down to what he thought was about fair; he said it ought to be $3000, but they would take $2000. I said I thought the figures were very high; I asked him if he could not take $1000; he said ' No; that there would be a majority of the committee and that would be less than $300 apiece.' I asked then if he could not take $1000 cash and give time for the balance of the $2000. He said, ' No; that would not do, if there was paper given, it might tell some tales.' Then, to put him off, I made an excuse that we would come to Philadelphia with them; I did that to find where we stood on our lease."

In reference to the lease of the relators, we have the following: The resident agent testified: " Have been offered money to procure leases; Vandyke offered me one thousand dollars if I could get him leases of the Kehley Run tract. I told him I had nothing to do with giving out the leases; that belonged to the committee on the Girard estates."

Vandyke, one of the relators, was sworn. After detailing the advice of Burd Patterson to make application for the Kehley Run property, he proceeds: " In consequence, with Mr. Wadleigh, my associate, I came to the conclusion to do so ; the question arose how to proceed. Mr. Patterson, in conversation, stated that I had better get Mr. Kaercher (the agent) to make my application and pay him for it. I remarked I did not like the proceeding, but I said if a few hundred dollars were of any value to Mr. Kaercher, to me it amounted to very little." He then details his application to Kaercher, and his consent to recommend the lease, and comes to his version of the offer of money : " I then said to him, ' Now, Kaercher, you do not get much pay. What do you get, any way? This is a large estate.'

'Well,' said he, 'they do not pay me a great deal.' I understood some five or six hundred dollars—some small amount. My remark to him was, 'you ought to have more.' Said he, 'I know it, and perhaps I will get it in some way from the estate.' I then said, 'If I get my lease of the Kehley Run property, I will make you a present of $1000.' I meant it, as it is well known that he is in distressed circumstances. It was an off-hand good-will declaration."

Wadleigh, the other relator, says: "I knew it was understood between myself and Mr. Vandyke that, in consideration of his services in showing us how to offer for the land, and other services in enabling us to get the lease, if we got it, he, Mr. Kaercher, was to have a present of $500 or $1000. This was understood as an open conversation. I do not remember whether he accepted or repudiated it. I do not see any impropriety in the offer. I paid $50 once for an introduction to a gentleman by a person whose introduction would create a favourable influence."

The impression made by this testimony upon the committee of five may be seen in their report. It says: "Messrs. Vandyke and Wadleigh were applicants for the most valuable of them (the coal lands). We append their testimony, which will fully explain the conclusions to which we have come in regard to these gentlemen. They both admit that they offered $1000 to the resident agent of the city if they should succeed in obtaining the lease. They endeavour to defend this offer by refined distinctions, and, rejecting Mr. Kearcher's mode of stating what occurred with some apparent feeling, they adopt another, which is perhaps stronger against them. We cannot doubt the impression which their own account of the matter will have upon all correct and right-minded men."

After exonerating Mr. Kaercher, the committee conclude by recommending that the resolutions granting leases to Messrs. Wadleigh and Vandyke should be vacated. The resolutions here referred to, appear by the paper-book to be those of the committee on the Girard estates; not of the councils.

In reference to the conduct of the committee of three by whom the lease to the relators was recommended, the report, after referring to matters quite unfavourable to two of the members, proceeds: "The evidence in regard to this latter gentleman is so conclusive, and his failure to attend, or offer to deny or rebut it, confirm it so decidedly that we deem it unnecessary to make detailed comments upon it. In boldly and unshrinkingly pressing his own corrupt demands, he did not hesitate to bring the whole of the committee on Girard estates under suspicion. Such conduct is a disgrace to the councils, and should meet with prompt and immediate punishment."

[Commonwealth *ex rel.* Vandyke *v.* Henry.]

Without further comment upon these unwarrantable transactions, it is sufficient to say, if ever a public officer was justified in declining to consummate a contract, obtained by what appeared to him to be corrupt practices, and therefore presumptively injurious to the public interest, it is this case.

But were the ordinance imperative in its terms, there is still a ground which requires a peremptory *mandamus* to be refused. No court will knowingly suffer itself to be the instrument to carry into execution a rotten and unsound bargain, especially where it affects an important private trust. It is said this is not a proceeding in equity, but that *mandamus* is a writ at law, and therefore the court cannot refuse its aid. This is true where the relator establishes his title to the writ. But it is settled that, to found the application, the law requires the applicant to establish a specific legal right as well as a want of a specific legal remedy; and also that the writ will be granted only in extraordinary cases to prevent a failure of justice: James *v.* The Commissioners of Bucks County, 1 Harris 75; Commonwealth *v.* The Canal Commissioners, 2 Penn. 518; Heffner *v.* The Commonwealth, 4 Casey 112. Now we have before us no case of a specific and fixed legal right, but an inchoate contract which can be perfected only by the very remedy the relators are seeking through the *mandamus*. The title therefore of the relators to have a perfect lease depends upon the fairness of their conduct in procuring themselves to be presented as proper parties to receive it. Their title to have the *mandamus* is the same they must present to have the lease; for, without a title to have the lease, they have no title to the writ. It is just at this point they fail. The evidence shows a proceeding to corrupt the channel through which their application must come, and a corrupt proceeding by the sub-committee by whom it was recommended. The application therefore appears before us with such a taint, we are justified in refusing to exercise the high and extraordinary powers invoked by this writ.

At this point it is proper to notice a technical objection made to the allegation of fraud. It is argued that the return of the mayor does not sufficiently aver the fraud relied upon. The fraud alleged is the offer of $1000 to the local agent to obtain for the relators a lease of the Kehley Run tract. This, it is said, does not touch the committee on the Girard estates, and is therefore simply irrelevant and not issuable. But the argument overlooks the fact that the relators themselves set forth the application to the local agent in their petition as at the very foundation of their proceeding, making it also one of their exhibits; and set forth also that this agent brought it before the committee, by whom it was referred to a sub-committee who reported in favour of this lease. It also clearly appears that this was the

[Commonwealth *ex rel.* Vandyke *v.* Henry.]

mode in which the cases were all brought to the notice and action of the committee in order that they should have the benefit of the knowledge of the local agent in reference both to properties and persons. It is therefore quite immaterial whether the general committee were personally privy to the fraud, or whether it was made to influence or control their action in ignorance of the fact that they were duped. If the committee are imposed upon by the recommendation of their agent, who is the proper and acknowledged channel of proceeding, the fraud upon the trust is as clearly established as if it were shown they were privy. The trust is to be protected against the injury, whether the committee participated in the wrongful purpose or not. It is not to be forgotten also that the resolution accepting the lease was founded upon the report of the sub-committee of three, whose misconduct is so clearly shown in the report of the committee of five, referred to and made part of the answer. The point is therefore purely artificial, and we should not suffer ourselves to be influenced by it, contrary to the averment of the relators, and to the injury of the trust.

But it is said that after the report of the committee of five against this lease, the relators have succeeded in silencing opposition, and that a re-examination has resulted in a favourable consideration of the application.

This is no sufficient reply. The mayor stands upon the evidence before the committee of five as well as the report, and the evidence still remains. Whatever change of views individuals may have undergone, the facts abide, and he has a right to plant himself upon them. We cannot see any good reason to overrule his judgment, or that the relators have any better title now to the writ.

And now, June 29th 1865, judgment upon the demurrer for the defendant, with costs.

THOMPSON, J., dissented, and filed a dissenting opinion.

WOODWARD, C. J., concurred.